# HOWARD COUNTY OFFICE OF HUMAN RIGHTS
## WRITTEN FINDINGS
## OF
## NO REASONABLE CAUSE

IN THE MATTER OF:　　　　　　　　　　＊

Miguel Tidwell　　　　　　　　　　　　＊　OHR Charge Number: 14-07-042
5349 Columbia Road, Apt. J　　　　　　　　EEOC Charge Number: 12E-2014-00032
Columbia, Maryland 21044　　　　　　　＊
**Complainant**
　　　　　　　　　　　　　　　　　　　　＊

vs.　　　　　　　　　　　　　　　　　　＊

　　　　　　　　　　　　　　　　　　　　＊　Charles R. Bacharach, Esq.
　　　　　　　　　　　　　　　　　　　　　Gordon Feinblatt, LLC
IMPAQ International, LLC　　　　　　　　　233 East Redwood Street
10420 Little Patuxent Pkwy. Suite 300　　＊　Baltimore, Maryland 21202-3332
Ellicott City, Maryland 21043　　　　　　　　**Respondent's Representative**
**Respondent**　　　　　　　　　　　　＊

　　　　　　　　　　　　　　　　　　　　＊

Date of Filing: July 25, 2014
Date of Authorization: August 11, 2014　＊
Date of Finding: May 13, 2015
＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊

## JURISDICTION

　　The charge of alleged employment discrimination on the basis of disability was filed by Mr. Miguel Tidwell (hereinafter Cp), on July 25, 2014, with the Howard County Office of Human Rights (hereinafter OHR), against IMPAQ International, LLC (hereinafter Rp). On August 11, 2014, this charge was authorized for investigation. It was investigated by the OHR pursuant to 12.200-12.218 of the Howard County Code.

　　Cp is alleging a violation of Section 12.208 of the Howard County Code. Cp filed the charge within six months of the alleged discrimination as called for in Section 12.212 I (a) of the Howard County Code. Rp is in the business of providing research and consulting services for government and private clients throughout the United States. Rp had the requisite number of employees in Howard County to satisfy the jurisdictional requirements of the Howard County Code. The Charge was also cross-filed with the Equal Employment Opportunity Commission (EEOC) pursuant to a work-sharing agreement between OHR and the EEOC alleging violations of the Americans with Disabilities Act of 1990 ("ADA") and the Americans with Disabilities Act Amendments Act ("ADAAA") of 2008.

I.  **SUMMARY OF WRITTEN FINDINGS OF INVESTIGATION**

<u>No Reasonable Cause – Discrimination as a result of a Disability</u>

OHR finds no reasonable cause to believe that Rp discriminated against Cp as a result of his disability. Rp points out that, prior to receiving a formal request from Cp's social worker regarding Cp's disability, it eliminated what it believed is an essential function of Cp's position and temporarily allowed Cp to conduct fewer than 10 calls per hour without adverse consequences. The record shows that once Rp received a formal request from Cp's social worker for accommodations, it engaged in the interactive process in order to determine what type of impairment Cp had and what, if any, accommodations he may need to perform the essential duties of his job. Rp essentially agreed to all of Cp's requests for accommodations except for a request that Cp's production standard be reduced to making seven (7) calls per hour. Rp stated that between May-July 2014 Cp completed slightly less than 7 calls per hour, which is less than half the number of calls as the average interviewer, and slightly more than half the number (13) set by Rp as the goal for all employees. Although Rp did not agree to allow Cp to only make 7 calls per hour, it did offer to reduce Cp's production goal to 10 calls per hour in response to Cp's request for accommodations; however, Cp did not accept Rp's offer.

The Equal Employment Opportunity Commission (EEOC) has held the position that an employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job. The record indicates that the production goal for Rp's interviewers working on the Job Corps telephone survey was 13 calls per hour. Rp offered to reduce Cp's production goal to 10 calls per hour as part of its reasonable accommodation proposal; however, Cp did not accept Rp's offer. There is no indication that Cp suggested or provided any alternative that would assist him in meeting the reduced goal of 10 calls per hour. In turn, OHR cannot conclude that Cp was discriminated against as a result of his disability.

II. **COMPLAINTANT'S SUMMARIZED ALLEGATIONS**

Cp alleges that he was discriminated against in that the performance metrics of his job had been changed, which would require him to make at least 13 calls per hour. Cp states that he informed his supervisor that he could not handle 13 calls an hour due to a disability and that he provided documentation in support of his request for accommodations. Cp goes on to say that Rp provided accommodations for his disability; however, one of the

accommodations that he received (a chair) had a sign on it that indicated that he had a disability. Finally, Cp alleges that his supervisor notified him that his disability accommodations were being rescinded without explanation.

### III.  RESPONDENT'S SUMMARIZED REPLY

Rp denies discriminating against Cp as a result of his disability or for any other reason. Rp states that Cp was the lead telephone interviewer and that the goal for its telephone interviewers is to make 13 calls per hour. Rp goes on to say that when Cp initially alleged that he had a disability and requested an accommodation, the documentation Cp referred to was a letter from a social worker that was not specific about Cp's impairment or what, if any, accommodation Cp may need. However, in light of the request for an accommodation, Rp eliminated part of Cp's job duties and temporarily allowed Cp to make less than 10 calls per hour without being subject to any adverse consequences. Rp states that after several months Rp had not provided any specific information clarifying his need for an accommodation. Rp then sent Cp a letter seeking specific information about his impairment and what accommodation he may need in order to perform the essential functions of his job. Rp said that it essentially agreed to all of Cp's accommodation requests except for the request for Cp to make 7 calls per hour. Rp contends that its goal of 13 calls per hour is an essential duty of a telephone interviewer. Rp stated that, in order to provide what it thought was a reasonable accommodation, if offered to lower Cp's goal to 10 calls per hour; however, Cp refused its offer and did not offer any alternative that would enable him to meet Rp's production goals. Thus, Rp contends that Cp is not a "qualified" individual under the ADA or the *Howard County Code*.

### IV.  THEORIES OF DISCRIMINATION

#### Disparate Treatment

A. Cp is a "qualified" individual with a disability;

B. Cp was discharged;

C. Cp was fulfilling his employer's legitimate expectations at the time of discharge;

D. The circumstances of Cp's discharge raise a reasonable inference of unlawful discrimination.

### Failure to Accommodate

A. Cp has a disability;

B. An employer had notice of his disability;

C. With a reasonable accommodation, Cp could perform the essential functions of the job at issue;

D. The employer has refused to make such accommodations.

V. **FACTUAL BACKGROUND**

A. Cp began working for Rp as a part-time employee in 2006.

B. In 2008, Cp became a full-time employee with Rp.

C. On November 7, 2013, Cp's social worker informed Rp that Cp was under the care of mental health professionals and may encounter difficulties experiencing higher levels of expectation at work.

D. On July 14, 2014, Rp notified Cp that it needed additional information regarding what type of impairment Cp had and what, if any, accommodation he might need in order to perform the essential duties of his job.

E. On July 25, 2014, Cp's social worker sent Rp a letter indicating what accommodations Cp would need to do his job.

F. On July 25, 2014, Cp filed subject *Charge* with OHR.

G. On August 8, 2014, Rp informed Cp that it essentially agreed to all of Cp's request for accommodations except for the request that Cp's production goals be reduced to making seven (7) calls per hour.

H. On August 11, 2014, the *Charge* was authorized for investigation.

I. On October 31, 2014, Cp resigned from his position with Rp.

VI. **COMPLAINANT'S SPECIFIC ALLEGATIONS**

**Allegation Number 1** – In 2013 one of my Assistant Managers (Mr. Tony Boston) announced that the performance metrics of my job were being changed, which would require me to handle at least 13 calls per hour.

**Finding Number 1 -**   OHR's investigation was unable to substantiate this allegation.

*OHR was able to determine that* Cp had been designated as the lead telephone interviewer on a project that Rp was performing for the federal government's Job Corps

program. OHR was unable to substantiate that Mr. Boston changed the performance metrics of Cp's job given that Rp had a goal of 13 calls per hour for all employees working on the Job Corps survey.[1] Rp also reports that its interviewers normally handle about 14 calls per hour, and that employees whose production falls below 10 calls per hour are subject to discipline. Mr. Boston reported when he came on board in February of 2013, he and the management team simply determined that all of the employees participating in the Job Corps survey should be attempting to meet the goal of 13 calls per hour. Moreover, Mr. Boston said that he never spoke to Cp directly about meeting the goal of 13 calls per hour.

**Allegation Number 2** – Around October or November of 2013, I met with my Manager (Ms. Stephanie Neighbor [sic]) and explained to her that I could not handle 13 calls per hour due to my disability. I provided medical documentation to the company in support for my request for accommodation.

**Finding Number 2** – **OHR's investigation substantiated this allegation in part but not as a whole.**

*OHR's investigator was able to substantiate* that Cp met with Ms. Nabor in the fall of 2013 and had a discussion with her regarding his being able to complete 13 calls per hour as a result of his disability.[2] OHR notes that, during the course of this investigation, Cp disclosed information to OHR that would appear to support Cp's claim that he has a disability. However, it does not appear that Cp provided the same information to Rp.

Cp states that in November of 2013, he provided Ms. Nabor with documentation that supports his claim that he has a disability and that he required an accommodation. There is no dispute that Cp submitted a letter to Rp dated November 7, 2013, from a social worker stating that Cp is under the care of mental health professionals and might encounter difficulties in obtaining higher levels of expectation at work. After receiving the letter from the social worker, Rp eliminated the requirement that Cp perform the tracing function[3] and temporarily allowed him to make fewer than 10 calls per hour without being subject to any

---

[1] Rp notes that 13 calls per hour is the production goal for the Job Corps survey, different production goals apply to other surveys conducted by Rp.
[2] For the purpose of this discussion, Rp will assume that Cp has a disability as that term is defined under relevant law. However, it reserves its right to challenge Cp's assertion that he has a disability.
[3] Rp states that tracing is performed by all interviewers in the call center aside from Cp and one other employee. Rp believes that tracing is an essential function of the position (and may take up to 25% of a lead interviewer's time); it voluntarily allowed Cp to abstain from tracing, even before the formal request was made by his social worker, so that Cp could focus on making calls.

discipline. Cp contends that as part of his accommodation, he was only required to make seven (7) calls per hour. Ms. Nabor stated that she always encouraged Cp to try to make at least 10 calls per hour until such time as Rp obtained specific information regarding whether Cp would need some type of accommodation.

Rp's witnesses stated that Cp failed to provide any additional information regarding his need for an accommodation. In turn, on July 14, 2014, Rp's Human Resources (HR) department sent a hand delivered letter to Cp seeking specific information about his impairment, and what, if any, accommodation he may need. Cp was given until July 28, 2014, to submit a response. By letter dated July 25, 2014, Cp's social worker responded to Rp with a request that Cp be allowed to complete seven (7) calls per hour, that the tracing function be eliminated, and that Cp be allowed to sit in a space where cross-talk is minimized. The record indicates that Cp filed the present charge on July 25, 2014, thus, Rp had little, if any, opportunity to engage Cp in the interactive process regarding his disability or any possible accommodation prior to Cp filing the charge of discrimination.

On or about August 8, 2014, Rp sent Cp a letter informing Cp that it had reviewed the request for accommodations that Cp's social worker had submitted on July 25, 2014. For the most part, Rp agreed to Cp's request except for the issue of reducing Cp's workload to seven (7) calls per hour. Rp pointed out that the primary essential function of Cp's job is to conduct telephone interviews for research studies and record the responses. Rp went on to say that during May, June and July 2014, its interviewers averaged 13 to 14 calls per hour whereas Cp averaged slightly fewer than 7 calls per hour. Rp also pointed out that it had already eliminated the tracing function from Cp's duties so that Cp could focus on making calls and conducting interviews. Rp said that it could not agree to eliminate a significant task, such as tracing, and, in addition, allow Cp to perform half the work of similarly situated interviewers. In turn, Rp said that it believed that an average of 10 calls per hour was reasonable. Ultimately, Cp did not accept Rp's proposal and resigned from the company on or about October 31, 2014.

<u>Allegation Number 3</u> – The company provided accommodations for my disability; however one of the accommodations that I received (a chair) had a sign on it that indicated that I have a disability.

<u>Finding Number 3</u> – **OHR's investigation was unable to substantiate this allegation.**

*OHR was able to substantiate that* although Rp contends that it is not aware whether Cp has a disability as that term is defined under the ADA or the <u>Howard County Code</u>, it did supply Cp a chair that was ergonomically better suited for Cp without requesting that Cp produce medical documentation. Ms. Nabor said that Cp simply indicated that he needed a new and/or different chair and she made arrangements to get one for him. OHR believes that there is insufficient evidence to conclude that Cp's chair had a sign on it that indicates he has a disability. Specifically, Cp's chair had a sign on it that said, "Reserved for Miguel Tidwell for ergonomic reasons while working." Rp contends that other employees have similar notes on the back of their chairs. Moreover, Rp states that immediately after receiving the charge, it replaced the note with one that says: "Reserved for Miguel Tidwell." Cp states that another co-worker had a sign on their chair that simply said: This chair is reserved for (name of person). The record shows that the letter from Cp's social worker does not mention any physical issue that would possibly be addressed by an ergonomic chair. Rp said that when Cp asked for a new chair, they gave him one. Cp even acknowledged in a letter to Ms. Nabor dated July 17, 2014, that the type of disability he has is not physical. OHR believes that there is insufficient evidence to conclude that a sign that states that a chair was reserved for Cp for ergonomic reasons would lead a reasonable person to believe that Cp had a disability.

<u>Allegation Number 4</u> – On July 8, 2014, my Supervisor (Ms. Lenora Ortiz) notified me that my disability accommodations were being rescinded. I was not given a reason why my disability accommodation was being rescinded.

<u>Finding Number 4</u> – **OHR's investigation was unable to substantiate this allegation.**

The record shows that in November of 2013, Cp's social worker submitted a letter that appeared to indicate that Cp may have a disability. Unfortunately, the letter from Cp's social worker does not specify what impairment Cp may have, how Cp's job would be affected by his impairment, and what, if any, accommodation would enable or help Cp perform the essential functions of his job. Although Cp initially did not provide any additional information regarding his disability or any accommodation he might need, Rp removed the tracing function from his job requirement, temporarily allowed Cp to make less than 10 calls per hour without being subject to any discipline, and gave Cp a new chair. It appears that Cp considered those things to be disability accommodations although Rp was unaware at the time what, if any, accommodation Cp would need.

Ms. Ortiz states that she never used the word accommodation with Cp, and that she never told him that an accommodation was being rescinded. She states that in June of 2014, she reviewed Cp's performance metrics with him and encouraged him to increase the number of calls per hour that he was making.[4] As stated earlier, Rp's employees whose production falls below 10 calls per hour are subject to discipline. Given that Cp was no longer required to do tracing, it appears that the disability accommodation that Cp is referring to is the number of calls per hour that he was required to make. Rp states that no one told Cp that he was only required to make seven (7) calls per hour as a disability accommodation. Rp points out that Cp was making slightly more than half the number of calls per hour (13) that had been set as the goal for all its employees.

## VII.   LEGAL SUMMARY

### No Reasonable Cause – Regarded as Disabled

Generally there are two types of claims that Cp could make under the ADA. The first is that the employer's adverse employment action was discriminatory based upon their disability. The second is that the employer failed to accommodate their disability. If Cp is claiming that Rp's adverse employment action was discriminatory based upon his disability, he would have to show that (1) he was a "qualified individual with a disability"; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination.

It appears that Cp's claim would fail under this standard. There is a question as to whether Cp was a "qualified" individual with a disability given that he could not make 10 or 13 calls per hour in his position as a telephone interviewer. In turn, there is insufficient evidence to conclude that Cp was meeting his employer's legitimate expectations at the time of discharge.[5] The record shows that Rp had a goal of 13 calls per hour for all of its interviewers that participated in the Job Corps survey. There can be no dispute that conducting interviews is the most important function of a call center interviewer. Cp appears to believe that Rp is required to lower its production requirements for him because he has a

---

[4] Rp states that Cp completed only an average of 6.59, 7.13 and 6.70 calls per hour for the months of May-July 2014.
[5] Rp did not discharge Cp. For the sake of discussion, OHR is assuming that Cp is referring to his resignation as a constructive discharge although that allegation was not made.

disability. That belief is misplaced. Rp correctly points out that the EEOC has held that an employer is not required to lower production standards that are applied uniformly to employees with and without disabilities.

1. **May an employer apply the same quantitative and qualitative requirements for performance of essential functions to an employee with a disability that it applies to employees without disabilities?**

    Yes. An employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job. [Footnote omitted]. Lowering or changing a production standard because an employee cannot meet it due to a disability is not considered a reasonable accommodation. [Footnote omitted]. However, a reasonable accommodation may be required to assist an employee in meeting a specific production standard.[6]

If Cp is claiming that Rp failed to accommodate his disability, his claim would fail under this theory as well. The record shows that, on or about July 25, 2014, Cp's social worker sent Rp a letter stating that (1) Cp needed breaks to get up once every 3-4 hours; Cp needed breaks for the intake of fluids; elimination of the tracing function; reduce ambient noise; and reducing workload to 7 records (calls) per hour.

Rp responded on August 8, 2014, by stating that Cp's current schedule allowed him to take breaks in order to get up and obtain fluids although it would adjust Cp's schedule if necessary. Rp went on to point out that the tracing function was eliminated from Cp's duties in September of 2013. With respect to the ambient noise issue, Rp pointed out that Cp works in a call center as the lead interviewer, thus, he needs to be around other interviewers for training purposes; however, Rp suggested that Cp contact his healthcare provider in order to determine if there was some sort of noise reduction device that Cp could use in order to help him concentrate. Finally, Rp pointed out that it could not reduce Cp's workload to 7 calls per hour, especially since it had already eliminated the tracing function and the other similarly situated interviewers were averaging at least 13 calls per hour. Rp went on to inform Cp that it believed an average rate of 10 calls per hour was reasonable.

---

[6] *The Americans With Disabilities Act: Applying Performance and Conduct Standards To Employees With Disabilities,* Section III. A. 1 [last modified on January 20, 2011] *at* http://www.eeoc.gov/facts/performance-conduct.html

Page 9 of 11

Requests by employees for accommodations under the ADA trigger something known as the "interactive process". The interactive process requires the employer to discuss with the employee and implement reasonable accommodations for the employee. OHR believes that Rp did engage in the interactive process with Cp and offered Cp a reasonable accommodation which Cp did not accept. As stated earlier, Rp essentially agreed to all of Cp's requests except to reduce the number of calls to 7 calls per hour. Rp stated that it could not eliminate the tracing function, which it saw as a significant job duty, and still allow Cp to perform almost half of the interviewing work of the other interviewers. Rp did offer, as an accommodation, to allow Cp make at least 10 calls per hour, which is almost 25% less than the goal for other interviewers. Cp did not accept this proposal, nor did he suggest or provide an alternative that would help him to meet the reduced goal of making 10 calls per hour. In turn, OHR believes that Cp did not show that he was a qualified individual who, with a reasonable accommodation, could perform the essential functions of his job.

## VIII.  DETERMINATION – NO REASONABLE CAUSE

Therefore, OHR finds no reasonable cause to believe that Cp was discriminated against as a result of a disability or perceived disability.

## IX.  OHR APPEAL PROCESS TO HUMAN RIGHTS COMMISSION (HRC)

The Complainant may appeal the attached Decision and Order by submitting a request in writing for an Administrative Hearing to the Howard County Human Rights Commission (HRC). Your request must be received by the HRC within 20 days of the date of these Findings (**June 2, 2015**). The HRC shall determine, after meeting and reviewing written statements filed by other parties, whether the Commission will hold a hearing. The HRC may decide to hear an appeal if good cause is shown and if it determines that such an appeal is in the public interest. An appeal for an Administrative Hearing must:

1. Be in writing,
2. State what portion of the Administrator's Findings is being appealed,
3. List the reasons for the appeal, and
4. Be addressed to:

Chair
Howard County Human Rights Commission
6751 Columbia Gateway Drive
Columbia, Maryland 21046

## X. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC) REVIEW PROCESS

Your case was originally cross-filed with the Equal Employment Opportunity Commission (EEOC); therefore, EEOC regulations entitle you to request that EEOC review the investigative agency's (OHR/HRC) final finding. You must request a *"Substantial Weight Review,"* in writing, within 15 days of the closure of your case by OHR and/or HRC. This request for a Substantial Weight Review must be sent to:

Mr. Natasha Abel
State and Local Program Manager
Equal Employment Opportunity Commission
801 Market Street, 13th Floor
Philadelphia, PA 19107

Date Submitted: 12 May 2015

Todd E. Givens, Investigator

Date Approved: 5/13/15

Dr. Barbara Sands, Administrator